Case number 23-50-76. Sault Ste. Marie Tribe of Chippewa Indians, Appellants v. Debra A. Haaland, Secretary, United States Department of the Interior, et al. Mr. Dunbar for the Appellants, Ms. Mishra for the Federal Appellees, Dechant for the Intervenor Appellees. Good morning, Mr. Dunbar. Good morning, Your Honor. May it please the Court. The issue today is whether the Sioux Tribe's purchase of land using interest from a self-sufficiency fund created under the Michigan Settlement Act satisfies the conditions of Section 108c4 of the statute. The plain meaning of the text, as well as the administrative record before the Department of the Interior, make clear that the answer to that question is yes. Section 108c4 turns on the Tribe's purpose in using fund interest, and the record before Interior shows the Tribe's objective end or goal, that is, its purpose in purchasing the land, was to help advance the social welfare and other needs of the Tribe. This property, which is called the Sibley Parcel, and which is located in Michigan's would provide a land base for the provision of direct social services to thousands of nearby Tribal members, and through planned Indian gaming on the property, the purchase would create Tribal jobs and establish a predictable, durable, and significant revenue stream to pay for vitally needed Tribal service. All of this, it's important to note, is perfectly in keeping with Congress's design of the Indian Gaming Regulatory Act, through which Congress established Indian gaming as a calibrated means of funding Tribal services and advancing Tribal welfare. In the order below, Interior didn't deny that those were the Tribe's purposes in pursuing the project. It simply claimed that the Tribe's purpose was, quote, too attenuated. But Interior's no attenuation position adds words of limitation to the enacted text that simply aren't there, and even if there were doubt about whether Section 108c4 contains an unstated directness or immediacy requirement, the Indian Canon would foreclose that reading of the statute. And with the Court's permission, I'd like to focus on those two points today. Can I ask you a question? Is an implication of your position in this case that the Tribe could purchase land anywhere it wants, decide to build a casino on it, and Interior Department would be required to take to trust and allow you to build that casino? Your Honor, yes, but let me answer it. I'll answer yes, but explain. I think there is an open question that's certainly not presented here about whether the Tribe could purchase land outside of Michigan. This is, after all, a Michigan Tribe. It was a treaty involving 13.8 million acres of land seated in the Upper Peninsula and the Lower Peninsula of Michigan. They're all Michigan Tribes affected by MILXA. I think there'd be a question, again, that's not presented here about whether land purchases outside of Michigan would be contemplated by the statute. But you are correct. Doesn't that circumvent, I guess, I don't know, I'm not an expert on IGRIT, but it seems that there are a lot of restrictions and limits and things that have to happen before gaming can happen, and doesn't your interpretation circumvent all that, as well as the compact that says you're supposed to negotiate a revenue sharing? Plan with other Tribes. We don't think so at all, Your Honor, and I'm glad you've gone to the policy consequences, because I do think that over the history of this case, it's clear that Interior is really starting with its fear about the policy consequences of the interpretation and then turning to the text of the statute. So I want to address those policy consequences head on, and I think there are three real answers to that, and I'll preview them and then can talk about them more in depth. To your Honor's choice, the first is that in enacting the Michigan Indian Land Claim Settlement Act in 1997, Congress would have understood that there are a variety of practical and legal restraints on having land taken into trust, as well as gaming on those properties. And again, I'm happy to talk about those in more detail. Second, I think it's also certainly the case that enacting a settlement, a land claim settlement statute, some nine years after Congress had enacted IGRA, which contained an exception that allowed gaming on after acquired lands for land acquired as a part of the settlement of a land claim, that Congress would have understood in 1997 that there could be potential interaction between the Gaming Act and the Michigan Indian Land Claim Settlement Act, and if Congress wanted to restrict gaming on land acquired as a part of the Settlement Act, it could have. And third, I think ultimately, whatever you think of those responses, the policy consequences, the fear that essentially the tribe bargained for too good of a settlement deal with Interior, which I have to say is a bit historically ironic, but even accepting that proposition, the answer would be Congress. The ball remains in Congress's court, so to speak, to restrict the tribe from some of the far-flung hypotheticals that are thrown around in the brief, endless land acquisitions, endless Indian gaming. Or isn't the response to that that we could interpret the statute in a way that avoids all this? Because I guess the provision that requires the government to take the land into trust carefully limits the spending of that money. And so if we interpret the statute that way, it avoids all of these issues that you just discussed. I think, Your Honor, that is correct. The other side would certainly like you to interpret the statute in a way that avoids those policy consequences, but the point is we don't think there's a textual foothold for doing so. The text that's at issue here, Section 108c4, I think has three distinctive features. First, it is clear that the inquiry is the tribe's purpose in using fund interest. Purpose, as we've explained in multiple dictionaries, and I don't think is contested, means an objective goal or end. But, Mr. Dunbar, at various points, it seems the tribe is arguing that it's really the tribe's subjective purpose. So if they are planning to build a for-profit casino and allocate a very small percentage of those proceeds to charitable purposes, that is the purpose of why they're acquiring the land. I mean, don't we have to look at some kind of objective purpose? Your Honor, I think I don't disagree with that, Judge Rao. I mean, we didn't mean to suggest— A subjective purpose would be arguably inconsistent with our first decision in this case. Well, I want to think about that and then circle back to that, but I do want to just make clear probably to resolve the need to do so that we don't—we're not saying it's only the tribe's say-so that counts, but certainly the tribe's purpose, stated purpose, its stated plans in acquiring the land ought to be a part of the analysis. And here, whether you think about it subjectively or objectively, I think there's layers of evidence that establish that the tribe's purpose in pursuing the Sibley Project was not to open a for-profit casino. That was not the tribe's end. It has no intrinsic desire to engage in gaming for the sake of gaming, and no one has suggested otherwise. And so the evidence of the tribe's purpose in this case, Your Honor, which I think goes beyond just the tribe's say-so, are the initial tribal resolutions approving the land purchase, which, as Your Honor noted, did dedicate symbolically certain commitments, earmarked commitments in 2012 for social service and other welfare purposes. The other side attempts to use that against us by suggesting that somehow we were only going to use a sliver of gaming revenue for social welfare purposes, but that I think badly misunderstands the context here. The tribe's board of directors in 2012 reasonably understood, like any legislative body, that it would be difficult to predict out five to six years what gaming revenues might look like, what social service needs might be of the tribe. And so it was reluctant to make specific earmarked commitments in 2012 of gaming revenues that might not be realized. I mean, we're now, obviously, unfortunately, 12 years past the time when the tribe actually purchased the land. But in addition to the tribal resolution, the tribe's trust submission, the simply partial submission at JA-473, JA-479, and JA-480 made clear that the tribe's purpose in acquiring the land was to potentially operate gaming facilities, which would be used to again, is precisely what Congress intended when it enacted IGRA. I mean, what about the fact that this statute that's before us, not IGRA, carefully delineates between the use of fund principle and fund income, right? And the only lands that can be taken into trust are those purchased with fund income for one of the designated purposes. I think that for fund principle, the tribe has much more leeway, arguably, under the statute. There are fewer constraints. There's a lot of discretion left to the tribal board. I think that's correct in a sense, Judge Rao. The one thing I would add is that I think it's significant that 108C, which governs the distribution of income, would allow the tribe to pay this money out in direct per capita or dividend payments to tribal members. Essentially, private, you know, more equivalent of sort of private wealth generation. The 108C-4, which again is the statutory provision issue here, says that the tribe can spend money for educational, social welfare, and other purposes. And in our view, a project like the Sibley Project, even if it could also be characterized as economic development, when the tribe has chosen a means that Congress has created through the Gaming Act to pursue social welfare means, that that fits within Section 108C-4. And just as a matter of plain meaning, I think our position is absolutely correct. To borrow a few just examples, someone investing money in a 529 savings plan, I don't think there would be any doubt that's for educational purposes. Someone taking money and investing that in a 401K, I don't think there would be any doubt that's for retirement purposes. Similarly, when the tribes spend, expended here, fund interest in order to invest in Indian gaming and land purchases that were carefully designed to advance tribal social welfare goals, this is similarly an expenditure for a social welfare purpose. Carefully designed for social welfare goals when you earmark 5%? I'm not sure how... Your Honor, I think that's where... Primarily designed for social welfare, where social welfare is just 5% of revenues. Your Honor, it's certainly the case that an ordinary casino, it's hard to see how that's a social welfare purpose. But in Indian gaming, I know how counterintuitive it may seem. It's precisely the case. The Supreme Court and the Khabazan ban mission decision recognized that tribal casinos are often the only way that a tribe, many tribes, which don't have natural resources to exploit, have an inability to tax on the reservation because the Supreme Court has allowed states to tax, which means any Indian tribal tax effectively becomes a double tax, that many tribes have no way to generate revenue other than gaming. Congress, when it enacted the Indian Gaming Regulatory Act, recognized that reality, but it didn't create Indian gaming as sort of a private profit free-for-all. It carefully limited and ensured that revenue generated from Indian gaming would be used to advance tribal purposes, including funding vital social services, which, again, is precisely what our client, through a variety of means, explained to Interior throughout this long trust process. It's important to note that Interior, again, didn't reject our position on the ground that it didn't believe that it was the tribe's purpose. It simply said that purpose was too attenuated. I think that no attenuation reading, if I may, it doesn't work for three reasons. Can I just ask a technical question? When you apply to have Interior take land in trust, is that a one-time application at the time of purchase? Or in other words, because it didn't appear that you ever sought below or with us a remand in order to kind of make a more fulsome explanation or anything of that sort. Is that ship sailed or is there any possibility of you augmenting your presentation? There is, Your Honor, and I don't think that ship is sailed. Obviously, you know, Interior spent two sentences in a footnote addressing our Section 108c4 theory in the order below. And again, all it said was that was too attenuated. Obviously, a lot has been said. A lot of ink has been spilled since. If what Interior is now saying is that it simply had doubts about whether the tribe actually intends to use gaming revenue profits to fund social welfare or other purposes, I do think there is all types. I mean, we think there's all types of evidence already in the administrative record that satisfies that. But we'd also certainly welcome the opportunity to explain that to Interior with supplemental materials. But to be clear, Your Honor, I do think- You didn't request that relief in the district court. You just said, let's go straight to city judge. That's correct, Your Honor. I would think of this remand question as a remedy question. And we certainly, in all events, there are some remaining issues that Interior never addressed that would need to be decided before the land is taken into trust. So we had always contemplated that there would need to be a remand to the department. And I certainly think it would be within either this court's or the district court's equitable discretion as a remedy in an Administrative Procedure Act case to do so. But I do really want to- I'd be remiss if I didn't explain that I do think there are no attenuation theory as a matter of statutory interpretation, just has no foothold in the statute. If Congress wanted to say that the tribe could use fund interest only to directly or immediately fund a social service like benefit, which I gather is essentially the upshot of the other side's position. Congress had multiple ways to do so clearly. I'm sorry, Judge Rao. Mr. Gumber, I mean, it seems that the tribe's application focused heavily on economic development as its rationale and only somewhat relied on 108C4. And so perhaps Interior didn't give a fulsome explanation of why it rejected that. But I think that's in part because of the way tribe justified its application in the first instance. Your Honor, it is true that the primary- we made alternative arguments. The tribe made alternative arguments in its trust submission. Your primary argument was closed, you know, was rejected. And so now, understandably, relying on 108C4. But that, you know, to sort of nitpick at what Interior did in light of what was before it seems- But, Your Honor, I do think, and probably take over time, but take all of my remaining time to list all of the places in the three and a half year long administrative process before Interior where the tribe did make clear that the purpose of this project is to pursue and be able to fund badly needed social services. That came not just in the initial trust submission. It came in the form of follow-up statements by the tribe's chairperson at the time, Aaron Payment. And this is at JA 536. He told Interior that these projects are vital to generate critically needed funds to support the delivery of services to our very large membership. He explained at JA 637 and 638 that the tribe, because of declining gaming revenues in the Upper Peninsula, was losing the ability to fund social services such as child care, elder assistance of various types, and that without a sustained new revenue source, which again Congress designed Indian gaming under the Gaming Act to provide, the tribe would be unable to fund vitally needed tribal services. We also submitted in a supplemental submission in 2015 an affidavit from the tribe's CFO. This is at JA 603 to 616 that explained this point concretely and pointed out that without a new revenue source, the tribe would face cuts in those coming years of $1 to $2 million in social service programs that were provided throughout Michigan, and that again, a primary purpose of the Sibley project, the land acquisition, was not only to be able to generate the funds necessary to pay for those, but also to directly be able to provide social services to the tribe's members in the Lower Peninsula. As the record reflects, there are approximately 4,500 tribal members who live near the Sibley parcel, which is outside of Detroit. The tribe currently has no trust base to be able to provide direct social services to those members of any type. To the extent they wanted to avail themselves of those services, they would need to travel to the Upper Peninsula of Michigan. Again, that was made clear time and again in the record. So, I do think, to Judge Wilkins, to your question, if Interior thinks there's more that it needs in terms of an explanation of the tribe's purpose, we'd certainly be happy to provide that. But I think the record already leaves no doubt that was the purpose. Interior didn't doubt that was our purpose. It simply fixated on a no attenuation theory or a theory that this was too speculative or indirect that we don't think has a foothold in the statute. And even if there were some type of proximate cause like unstated limitation in the statute, I do think it's important to emphasize that Indian gaming is not a Rube Goldberg-like mechanism for pursuing tribal welfare. It is, again, precisely the mechanism that Congress created, recognizing that tribes might not have any other available means of advancing the well-being of their tribe and tribal members and paying for social services. If you bought this land to build a school or something that clearly falls, undisputedly falls within the criteria, and it was taken into trust, and then you sought to build a casino on it, would you have to go through IGRA, like the whole process? It's an interesting question, Your Honor. I think at that point, I don't think we would, which, again, I think the tribe, the land, once it's taken into trust by Interior, would become Indian lands. I suppose a question would be whether we could game on it would then depend on whether the land was taken into trust as a part of the settlement of a land claim exception. In your hypothetical, assuming that the tribe had used fund interest to do so, I think it would qualify. But I think your hypothetical points to the fact that the tribe here was not attempting to engage in gamesmanship or pretext. From the outset, it was clear that it was purchasing this land and that it intended to use the land not only to provide direct social services to downstate members, but to build a casino on the property if it were able to do so. My question is just, is this an end run around IGRA? I don't think so, Your Honor. Again, the gaming consequences when Congress enacted the Michigan Indian Land Claim Settlement Act, it enacted that, doing my math right, nine years after the Indian Gaming Act had been recognized, Congress surely understood that enacting a settlement statute that allowed for land to be taken into trust would implicate IGRA. So we don't think it's an end run around IGRA. It's simply a matter of reading together two statutes, a settlement act and the Indian Gaming Regulatory Act. Particularly on the circumvention point, Your Honor, Interior addressed an earlier version, excuse me, a separate provision of the Michigan Indian Land Claim Settlement Act in a Bay Mills opinion. That case actually resulted in a Supreme Court case. In that Bay Mills opinion, and this is at JA 460, page 10 of the opinion, Interior noted that during the legislative process leading to Milks's enactment, Interior asked that Congress delete language that made the land acquisition provisions in the Settlement Act mandatory. And it also asked that Congress include a specific provision that, quote, would not repeal the limitations in section 20 of the Indian Gaming Regulatory Act. In other words, Interior, as the purported expert agency here, recognized that there affirmatively that Congress include a provision in the Settlement Act restricting gaming, and Congress chose not to do so, or Congress didn't do so. And so I think this is a circumstance where contorting the plain text of section 108C4 because of feared gaming consequences just would be an unnatural way to approach statutory interpretation, given that we would assume Congress was aware of and Congress intended the interaction between the Gaming Act and the Settlement Act. If this was an unintended consequence, Congress didn't consider it, principles of statutory interpretation would still counsel in favor of fidelity to the text, and that would leave the ball in Congress's court. If somehow the Sioux Tribe were able to launch a plan engaging in endless land acquisitions across the country to build casinos, Congress could easily put a stamp on those types of hypotheticals. I will say as a practical reality, Your Honor, that is highly, any additional land acquisitions are highly, highly unlikely. Land has to be acquired for the mandatory trust provision of the Settlement Act to be implicated, has to be acquired with interest. Fund interest is a limited pot of money. It depends on the principle continuing to generate interest. There are also vast pressing needs facing this tribe, including funding all manner of types of potential projects or economic development. So the idea that the tribe would dedicate endless resources to pursue casino operations or land into trust across the country is really lawyer rhetoric that's divorced from the reality of the situation. And I think this court can assume that if Congress understood the interaction between the Gaming Act and the Settlement Act, which it should have, it also could have understood that there are practical and legal constraints on far-flung land acquisitions and endless gaming. And again, if I'm wrong about that, or we're wrong about that, and this was just something Congress didn't consider, and it's not something that it intended to pursue, it intended Congress can fix it. I do think it's important to keep in mind, though, that in considering these hypotheticals, the broader context here, which is that the settlement statute settles land claims for the historic unconscionable taking of 13.8 million acres of property across the Upper Peninsula and the Lower Peninsula of Michigan. So the idea that Congress would have intended a land claim settlement statute to give the tribe some ability to acquire land to be able to meet the vast and pressing needs of its members is not something I think that would be unusual or unexpected or certainly not absurd, although no one, I don't think, has invoked the absurdity canon in this case. All right. I think you're well over time, unless my colleagues have any questions. We'll give you some time on rebuttal. Thank you, Your Honor. On behalf of the Secretary, we have Ms. Mitchell. Good morning. Good morning. May it please the Court, Tina Mishra for the United States Appellees. Critique shall argue for tribal and other interveners in support. This Court's prior decision in this case provides the ground to reject the Sioux's secondary appeal here. The Sioux sought to use fund interest under subsection C, not for what this Court called its, quote, limited and exclusive, quote, uses under the Michigan Act and which this Court contrasted with the, quote, more expansive, end quote, uses for fund principle under subsection B, but instead toward what Interior correctly found to be the Sioux's too uncertain and attenuated goal to get land on which there might be a casino venture that may have gaming revenue, notwithstanding other obstacles like a tribal state compact, acre conditions, et cetera, for which the Sioux, there might be spending, but the Sioux committed only 5% to what the Sioux claims would qualify as health, social welfare, and the like. Ms. Mishra, if we assume that, you know, just for the purpose of this question, that they could build a casino, you know, subject to all the other regulatory and statutory requirements, and if the tribe were to designate 100% of its proceeds to social welfare, would that be within 108C4? We think that Interior's opinion would be that it's not, and that's because there's another attenuation or uncertainty juncture that is not addressed and that has been alighted a little bit by the discussion thus far, which is that even if there were to be a casino, would it be able to conduct, for example, what the Sioux's called, quote, casino-type gaming, which it has described as, quote, the class three gaming that is implicated by the tribal state compact, for example. So we think that there are multiple junctures at which Interior's determination that it was too uncertain or attenuated could be sustained as to any of those, and so we do think that this case would need to come out in Interior's favor. I guess what I'm trying to get at is if there's some sort of economic development project that the tribe is contemplating, and it's more of the proceeds of that economic development project are for charitable purposes, would that be, would that fall within 108C3? C4? So as we understand the statutory language and this court's interpretation of it in the prior appeals, we don't think that that kind of downstream use is the kind of, not of fund interest, but of some generated revenue is the kind of thing that's comprehended by C and C4 specifically. And the things that we would point to, for example, is as this court described, C is about, quote, uses of income or interest. It's not about something downstream. Talking about it as uses, as this court did in the prior opinion, kind of crowds out this subjective intent type of approach, for example, or that type of plan that the Sioux has proffered, because it also crowds out that downstream aspect, because the idea is that it needs to be educational, health, et cetera, in nature as to itself. And we think that purpose in the context of that should be understood to be use, as this court said in the prior opinion, because it's something more objective. It's not about this kind of intent or downstream use. We think that's also reinforced by the statutory language that talks about educational, et cetera, and then says which benefits separately. We think it's reinforced by the contrast with B, which talks about economic development or these broader purposes or uses, and C does not, as this court observed before. And we think that the other part of this court's opinion that reinforces is when this court talked about interior's important role in this respect and pointed out that C, for example, does not have express mention, unlike B, of the tribe's role, for example. We think that also undercuts the subjective intent or kind of downstream approach to the statute. As we mentioned, there are these multiple different attenuation junctures or uncertainty junctures, as to any of which we think that interior's important. I think the tribe says, well, job training is very important, and so we're going to build a casino, hire, you know, to the extent that we can, exclusively tribe members, train them, give them, you know, skills so that they can get jobs in other casinos or in other hospitality-related or gaming-related fields, and to the extent that this, we don't even know if this casino's going to make any money, but to the extent that it does, every penny will go towards, you know, health care or child care or something of that nature. So, they say that part of the purpose is not just to use the revenue from the casino, but also to have the casino's operation itself provide both jobs, but also job training. So, the first point we'll make is that, of course, the record here doesn't say any of that, but as to your question and the hypothetical specifically, one thing that we would point out is that the question of a job training center, those types of things, or hospital, et cetera, those are things that Interior said may be something that, in a context-specific, fact-intensive way, Interior might make a determination about in the future, but that is something that could be tied up with, as we discussed, these other types of attenuation. So, for example, do you project that you're going to do this down the line? That doesn't necessarily mean that it is, in fact, going to be achieved that you're going to do this, or likely even to be achieved that you're going to do this. Where has Interior ever set forth how it judges when something is too attenuated, or what type of evidence is necessary? So, as we understand it, Interior here just expressed that the SUE's position was not something that could be sustained here, as to our understanding. There are no regulations, there's no guideline, there's no policy document, there's no interpretive rule. So, our understanding is that this Court has made interpretive rulings that we think support Interior's understanding of how the statute operates here, and it did so in the prior appeals. I'm not aware of specific regulations under MILXA that make any formal interpretive ruling about this type of nature, but what I will say is that this case is one in which the review is for the reasonableness and non-arbitrariness or capriciousness of Interior's ultimate conclusions, applying its understanding of the statute, which we believe is consistent with this Court's prior opinion. So, this Court could, without getting into a lot of the intricacies, could determine here that this appeal by the SUE needs to be rejected and that the Interior determination was ultimately not just reasonable but correct under just the ordinary APA review, without getting into every individual instance and whether it would qualify. And that's similar to what this Court did in not answering every statutory question with respect to C-5 on the prior appeal as well. It didn't say, here's the test for all time, but it said, you know, here are some things that we know do not qualify under C-5, and that was what the SUE had proffered there. If I may, I'd like to address the record, because I do believe that that's something that also relates to Your Honor's question relating to the remand question, which, as I think is acknowledged, was not requested in the District Court. It also was not requested at any time, as I understand it, in the briefing, certainly not in the opening brief's request for remedies here. But at any rate, we think that it's important that this Court understand that the particular record documents that are being referenced do not actually add up to something that would make out especially any of these alternative theories about direct delivery of social services. So, for example, the reference to affidavits primarily concerned there's only really three affidavits in the record. 573 to 583 in the joint appendix is only about tribal enrollment figures and spreadsheets of population numbers by county and things like that. 604 to 606 talked about primarily a conclusory statement about enhancing the upper peninsula land holdings. It wasn't really directed at this particular parcel in question downstate, and so it was really more about a kind of gaming revenue theory. It wasn't directed at the alternative theory of kind of direct delivery of social services or anything of that nature. In addition, 618 to 619 was the only one that even really seemed to concern services, and that one, as we described in the brief, talked about there being some limited issues of housing or expressing concern but didn't actually express affirmative intent or a plan or anything that would actually use the fund interest for any of those purposes, for example, directly. And so what we would say is that we don't think any of those alternative theories can be sustained here. We think that the position that Interior took is sustainable both from the many different attenuation junctures and also from this court's prior opinion and the reasons why that counsels for that reading. The other thing we'll just note with respect to the even possibility of a remand is that in addition to it not being requested, the sue here had multiple opportunities. They had multiple opportunities before Interior to supply evidence. They were requested to supply additional evidence. They've already had a first appeal even before this court on the C-5 question, which to their point about concern about whether tribes can get land, et cetera, C-5 is directly concerning land. That's not an issue on this appeal. It's not been appealed here, and so that's not really something that's really presented for this court. And so ultimately what we would say is that there's not much reason to give yet another round for further litigation, in particularly because, as we've pointed out, the attenuation juncture that gets into Class III gaming and the tribal state compact and all these complexities with IGRA, et cetera, as we've noted, there are tribal interveners here. There are others who have objected throughout, and there's likely to be a lot more that would go on with respect to whether this could even get to gaming on the parcel, for example. So I guess the one other thing I'll flag on the record is that I also, just as we understand it, conclusory assertions of the chair primarily about where members are and how many of them and things like that and overall revenue numbers. They really didn't make out this kind of particular alternative theory. I guess the one other thing that I would say on the record as well is that the conclusory statements not being evidence is something that hasn't really come up here, but we think that is obviously sustainable for the reasons we've stated in the brief. And so for all these reasons, we don't think that this court could decide to sustain interiors determination at any of these many different junctures, depending on what it chooses to decide here. We don't think that this court need to take on any more than it chooses to, and we would just urge this court to sustain interiors determination and from the district court here. Thank you. Good morning to Shah. Good morning. May it please the court, Pratik Shah for interveners. The Sioux tribe seeks to upend the settlement X carefully crafted framework to procure an unprecedented expansion of casino gaming into the ancestral homelands of other Indian tribes. Having lost on their primary argument the last time around, the Sioux now evoked a charitable purposes provision that makes no reference to gaming at all. But the Sioux cannot use the casino gaming. That last-ditch effort cannot be reconciled with Section 108C4's ordinary meaning or Congress's explicit choice to distinguish, as this court itself described, the broader uses of fund principle authorized in 108B, including expenditures, quote, reasonably related to economic development beneficial to the tribe, which is what the narrowly defined categories for use of fund interest specified in 108C. That distinction is critical given the dramatically different consequences flowing from use of those respective funds. Only lands purchased under the more limited 108C, not the broader 108B, trigger interiors exceptional and mandatory take into trust duty. Mr. Shah, can you address the arguments made by Mr. Dunbar about the relationship between the statute before us here, you know, the Michigan Land Settlement Act and IGRA? Yes, thank you, Judge Rauh, for that question because I think it's critical. I think the move that they're trying to make is they say, well, even if that's all is different because it's necessarily used for social welfare. That is not true under IGRA. IGRA provides five uses of casino gaming revenue. They only quote two in their brief. They quote the charitable purposes and the funding social services. IGRA is much broader. IGRA, and this is 25 U.S.C. 2710B2B. It's quoted in full in our brief. That lays out what Congress has said tribes can use gaming for. Of course, any time a tribe undergoes economic development, it's using it for the welfare of the tribe. That's what tribal governments do. That's why 108C says for the, B, I'm sorry, B says for the benefit of the tribe. IGRA maps on almost coterminously with 108B, not C. Here's what IGRA says. You can use it to fund tribal government operations or programs. That's one that they quote. Two, to provide for the general welfare of the Indian tribe and its members, not social welfare, education, health, and charitable purposes, general welfare. That's like 108B. To promote general tribal economic development. That's exactly the words used in 108B. To denote, to donate to charitable organizations. That's part of C. Or to help fund operations of other local government agencies. The tribe doesn't even have to keep the money. In casino, in gaming, they can donate, they can use the funds of gaming to, say, fund the local police department of the city in which the casino is located because of externalities. So, yes, of course, casino gaming or any economic venture entered by a tribe is for the benefit of tribal members, for the general welfare. That's very different than 108C4, which says, specifically, you have to, using the no-sitter canon, right, for education, social welfare, health, cultural, or charitable purposes. That's not anything that benefits tribal members. You may use it for infrastructure. You're going to build roads, water services, all of that. That's not education, social welfare, health, cultural, or charitable purposes. It has a narrower meaning than 108B, which is anything that's to benefit tribal members. That's the critical move they're trying to make. Their record evidence before Interior was only 5% goes to that specific social welfare purpose. The other 95%, general welfare for the tribe. There's nothing in the record that commits them to using it, to not building roads, bridges, not giving it to the police department to stop crime coming from the casino, any of those things. That's well outside of 108C4. That's 108B territory, which is why Congress designed this special scheme. Anyone who knows anything about Indian law knows Congress and the tribes aren't going to negotiate an act like this and pass an act like this that is silent on gaming and then mean to back it in and allow them to open a casino near other tribes' reservations. That's incomprehensible that anyone had that in mind. That's why 108C4 is, of course, silent about gaming. It doesn't make any sense to suggest that you could use that narrow provision to allow, again, probably the most provocative issue in all of Indian law. Thank you. Thank you, Your Honors. All right. Mr. Dunbar, you are out of time, but we'll give you two minutes on rebuttal. Thank you, Your Honor. Three quick points. First, I think DOI's interior's position here really shows that they've gone all in on a really unexplained no attenuation theory. All of the obstacles to gaming that they've identified, the potential need for Indian gaming determination, the compact, there's not a word of an actual explanation by interior in the trust denial order on any of this. So the whole theory that we might never be able to game and there are too many obstacles is simply unexplained. And to Judge Wilkins' question, that alone would be a basis for a remand to the agency. We, of course, think the no attenuation theory has no foothold in the statute. When we speak of someone taking an action for a purpose, there is no guarantee of success requirement built into that. To take the example from our brief, if someone spends money for educational purposes or law school education purposes to take the LSAT, that money is still for those purposes, even if that student realistically assesses his or her chances at 1% of actually gaining law school admission. The money is spent for the same point. But if interior is essentially going to claim to this court that they denied the trust submission because they fear there were simply too many attenuated steps and that the tribe might have difficulty gaming or the gaming compact, none of those issues are briefed. None of those issues were addressed before interior. That would be a basis for a remand. Second, on the question of the delta between the permissible uses of gaming revenue under the Gaming Act and what is allowed under Section 108C4, I just have to remind the court that the statutory inquiry is the tribe's offset the cost to local communities, non-tribal communities that might be related to the operation of the casino, such as roads, police. The idea that this tribe, the Sioux tribe, engaged in this particular project with the purpose of somehow funneling money to local non-Indian tribal communities, and that was the reason it undertook that project, simply makes no sense in this of gaming revenue and what's specified in Section 108C4. But there is simply no evidence, much less has there ever been a suggestion that the tribe's purpose in undertaking this project is because it wanted to funnel money to that delta. Finally, on the silence about gaming point, I think I've addressed this in my principal argument, but I would simply say that Section 108C4 purposes. In other words, it's not a surprise that Section 108C4 doesn't say to achieve these purposes, the tribe can do X, Y, and Z or can't do X, Y, and Z. Congress understandably left choices about how to advance the tribe's purposes, whether it's casino gaming, whether it's some other social service measure to the tribe and to the tribe's democratically elected board of directors. So again, the absence of a specific provision for gaming has things exactly backwards when you look at the statutory text, which again, focuses on the tribe's intent, its object, or its goal. And at the end of the day, we believe there is simply no basis in the record for saying that the tribe's purpose in pursuing the Sibley Project was for any purpose other than advancing the tribal, the needs of the tribe and its members, including social welfare, economic, educational. Thank you, Your Honor. We'll take the matter under advisement.
judges: Wilkins, Rao, Pan